UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COMERICA BANK,
a Texas banking association,
successor in interest by merger
to Comerica Bank, a
Michigan banking corporation,

       Plaintiff,

v.

JAMES R. JONES,
a Washington, D.C. citizen,
STONE CANYON VENTURE
PARTNERS, LP, a Delaware
limited partnership, WEST COAST
OPPORTUNITY FUND, LLC,
a Delaware limited liability company,
and SANDHARBOR INVESTMENT
COMPANY, LLC, a Nevada limited
liability company,

       Defendants.
_____/

Case No. 10-CV-14572

HON. GEORGE CARAM STEEH

OPINION AND ORDER GRANTING PLAINTIFF/COUNTER-DEFENDANT'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

On November 17, 2010, plaintiff/counter-defendant filed this action seeking, in part, the payment of $950,000 to Comerica in partial satisfaction of Comerica's loans to Catalina and UFE. Defendants filed a counterclaim asserting, among other things, entitlement to the $950,000 from the sale of UFE Singapore's stock. Before the court is plaintiff/counter-defendant's motion for partial summary judgment. In its motion, plaintiff/counter-defendant seeks judgment on Count I of its amended complaint, defendants' counterclaims, and all of defendants' affirmative defenses. Oral argument occurred at a hearing on this motion on June 20, 2011. For the reasons that follow, the court grants plaintiff/counter-defendant's

motion for partial summary judgment.

BACKGROUND

The Security Agreements

On April 25, 2008, UFE executed a Security Agreement that secured all existing and future indebtedness of UFE and Catalina to Comerica. Under the UFE Security Agreement, UFE agreed that Comerica had a security interest in all present and future assets of UFE. The UFE Security Agreement defined collateral to include, *inter alia*, all of UFE's "Accounts Receivable" (including all accounts, general intangibles, chattel paper, and rights to payment for money or funds advanced or sold) as well as all of UFE's inventory, equipment and fixtures, software, and investment property ("including, without limit, securities, securities entitlements, and financial assets").

The March 2009 Master Revolving Note

On March 31, 2009, Catalina and UFE executed a $7,000,000 Master Revolving Note in Comerica's favor. Under the March 2009 Master Revolving Note, Catalina and UFE agreed to pay Comerica all outstanding amounts (including interest thereon) due under the Note on Comerica's demand. The March 2009 Master Revolving Note also provides that if Catalina and UFE fail to comply with any agreement with Comerica, Comerica may declare a default. In the event of a default, Comerica is entitled to declare any and all indebtedness under that note (and any other notes executed by Catalina and UFE) to be due and payable "and exercise any one or more of the rights and remedies granted to [Comerica] by any agreement with [Catalina and UFE] (or any of them) or given to it under applicable law."

The March 2009 Master Revolving Note was replaced with a virtually identical note,

in the amount of $5,750,000, on September 29, 2009.

The Single Disbursement Demand and Term Notes

On September 29, 2009, Catalina and UFE executed a $500,000 Single Disbursement Demand Note. The Single Disbursement Demand Note was payable on Comerica's demand. Also on September 29, 2009, Catalina and UFE executed a $1,202,666.72 Term Note. Both Notes provide that if Catalina and/or UFE are in default of any agreement with Comerica, Comerica may declare a default.

Comerica's Alleged Representations

Michael Seibert, a representative from Stone Canyon, attests that he met with Atticus Lowe from West Coast, Comerica's loan officer Michael Sheehan, and Comerica bank officer Andrew Ottaway on January 22, 2010 to discuss the status of Comerica's loans to Catalina and UFE. Seibert states the bank officers represented that investors needed to make a $1,000,000 capital infusion into UFE and that the investors would receive a subordinated participation interest in Comerica's loans to Catalina and UFE. Seibert represents he and Lowe told the bank officers that the investors would want to secure their participation interests with a lien on the assets of UFE Singapore that would not be subordinated to any Comerica security interests or liens. He attests Sheehan and Ottaway stated Comerica had no objection, because the UFE Singapore receivables and other assets were of no value to Comerica and the bank had not taken a security interest in UFE Singapore or its other assets. He states the bank officers said Comerica would not object if the investors were to secure the purchase of their participation interests in the Comerica loans by taking a security interest in and placing a lien on UFE Singapore and its assets and that the lien would not be subordinated to any Comerica security interests

or liens.

Catalina and UFE's Defaults and the Forbearance Agreement

On February 12, 2010, Comerica declared the September 2009 Master Revolving Note (and the other notes described above) in default. On March 4, 2010, Catalina, UFE, certain defendants, and Comerica entered into a Forbearance Agreement. The parties to the Forbearance Agreement agreed that Catalina and UFE were in default of the March 2009 Master Revolving Note (and the other notes described above) and that Comerica would forbear from certain enforcement activities until June 1, 2010 (subject to earlier termination). In connection with the Forbearance Agreement, Catalina and UFE executed a March 4, 2010 Master Revolving Note in the amount of $6,700,000 that provided it was due on Comerica's demand.

The Subordinated Participation Agreement

Also in connection with the Forbearance Agreement, on March 4, 2010, James Jones, Gregory Willis, Stone Canyon Venture Partners LP, West Coast Opportunity Fund, LLC, and Sandharbor Investment Company LLC (collectively, the "Participants") entered into the Subordinated Participation Agreement with Comerica. Under the SPA, the Participants purchased a last out, subordinated (that is, junior) participation in Comerica's loans to Catalina and UFE totaling $950,000. Paragraph 2 of the SPA provides:

> Concurrently with the execution of this Agreement, Participants (other than Gregory Willis) shall pay to Lender in immediately available funds an amount equal to the First Participation Amount in the amounts provided below. On or before March 15, 2010, Gregory Willis shall pay to Lender in immediately available funds an amount equal to the Second Participation Amount. Effective as of the date of payment of the First Participation Amount or Second Participation Amount, Lender sells and grants to Participants, and Participants accept from Lender, an undivided, subordinated participation in the Loans, in each case, in the amount of each Participant's portion of each

> Participation Amount (Stone Canyon - First - $643,000; West Coast - First $100,000; Sandharbor - First $113,000; Jones - First $28,000; Willis - Second $66,000).

The Participants further agreed in the SPA that their participation in the loans by Comerica to Catalina and UFE "shall in all respects be subject and subordinate to the rights of [Comerica] in the balance of the Loans and shall be subject further to the limitations provided below." In other words, the Participants agreed that Comerica is entitled to be paid on its senior portion of the loans to Catalina and UFE before the Participants are repaid any amount on account of their $950,000 participation. Paragraph 5 of the SPA provides:

> Participants shall not be entitled to any monies received by Lender in accordance with the provisions of the Loan Documents, whether directly or indirectly from the sale or liquidation of any collateral or otherwise in reduction of its Participation unless and until Lender's portion of the Loans shall have been irrevocably repaid in full and all other reasonable costs, expenses, consultant fees and attorneys' fees of Borrowers to Lender have been irrevocably paid in full and Lender's loan commitments to Borrowers, if any, have been terminated. If at any time prior to the time that all Loans have been irrevocably paid in full (as described in the previous sentence) Participants shall receive from any source whatsoever (whether by direct remittance, setoff, recoupment, foreclosure of security interest or otherwise) any payment on the Loans, Participants will hold such payment in trust for Lender and promptly pay over to Lender such payment in the form received with any necessary endorsements...

The Participants claim they relied on Comerica's representations, including that UFE Singapore's assets were outside the scope of the SPA, in entering into the SPA.

Default

On April 22, 2010, Comerica notified Catalina and UFE that they were in default of the March 2010 Forbearance Agreement (and, therefore, the March 2010 Master Revolving Note).

5

Catalina and UFE Cease Normal Business Operations

Comerica was informed by Catalina and UFE's president and CEO Willis, and CFO Zickfeld, that they had resigned from their positions as officers of each company and that all members of the board of directors had resigned. On Friday, July 23, 2010, defendants Willis and Zickfeld informed Comerica that they intended to cease Catalina and UFE's business operations and liquidate Catalina and UFE's assets. On August 4, 2010, Comerica filed an action against Catalina and UFE in this court where a receiver was then appointed over Catalina and UFE's property.

Participants' Lien on Assets of UFE Singapore

On or about July 16, 2010, several of the Participants (through Stone Canyon, as agent) placed a lien on the assets of UFE Singapore, UFE's wholly owned subsidiary. The security documents prepared by Stone Canyon and signed by UFE Singapore purport to take and/or place a lien on the assets of UFE Singapore to secure the $950,000 participation in Comerica's loans to Catalina and UFE as defined in the SPA. On July 29, 2010, Comerica informed Participants and counsel for Catalina and UFE that the granting of the lien was without Comerica's consent and is prohibited by UFE's loan agreement. Comerica also stated amounts received on account of the lien must be paid to Comerica under the SPA.

December 17, 2010 Order

On December 6, 2010, in the receivership action before this court, the receiver moved for an order authorizing it to sell UFE's interest in UFE Singapore and approving and confirming the sale of UFE's interest in UFE Singapore free and clear of any and all liens, claims, security interests and encumbrances of any kind or type and transferring

claim to the net proceeds of sale. (Dkt. #66, Case No. 10-cv-13089). SCVP, LLC and Stone Canyon opposed the motion. On December 17, 2010, following hearing on the motion, the court entered an order approving the sale, transferring the lien to the proceeds of the sale, and preserving the arguments of the parties with respect to the $950,000.

Current Proceeding

In this case, Comerica seeks, in Count I of its amended complaint, an order requiring the indebtedness of Catalina and UFE be satisfied, in part, by payment of the $950,000 to Comerica. Defendants Jones, Stone Canyon, West Coast, and Sandharbor filed the following counterclaims: (1) declaratory judgment; (2) fraud/fraudulent inducement; (3) breach of contract/anticipatory breach of the SPA; and (4) reformation of the Subordinated Participation and Forbearance Agreements. In their declaratory judgment counterclaim, defendants seek a declaration that the lien is valid, that the agreements do not give Comerica entitlement to the $950,000, and that defendants are entitled to payment of $884,000 of the $950,000.

On April 13, 2011, Comerica filed a motion for partial summary judgment seeking judgment in its favor on Count I of its amended complaint, defendants' counterclaims, and all of defendants' affirmative defenses. The claim that Stone Canyon's investment in UFE and Catalina and its payment for its participation interest should be allocated to reduce and/or eliminate the Support Agreement obligations of West Coast, Jones, and Sandharbor, an issue presented in defendants' counterclaims, is excluded from the summary judgment request and therefore not before the court at this time. On May 11, 2011, defendants filed a response to the motion. Defendants argue (1) there is a question of fact as to whether the UFE Singapore stock is covered by the UFE and/or Catalina

Security Agreements (and therefore whether payment of proceeds from the sale of the assets of UFE Singapore constitute "payment on the loans" as defined in the SPA); (2) there is a question of fact concerning defendants' fraud/fraudulent inducement claim, which would render the contract at issue voidable; and (3) the December 17, 2010 order in the receivership case does not resolve the issues in this case.

STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there

be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. Id.

ANALYSIS

Comerica's Declaratory Judgment Claim

In Count I of its amended complaint, Comerica asserts defendants breached the agreements by placing a lien on UFE Singapore's assets. Comerica claims the SPA gave defendants only a subordinated participation in Comerica's loans to UFE and Catalina and thus Comerica should be paid the $950,000 in proceeds from the sale of UFE Singapore stock as the stock is covered by the UFE Security Agreement. Comerica seeks a declaratory judgment finding Comerica is entitled to the $950,000.

It is well-established Michigan law that "unambiguous contracts are not open to judicial construction and must be *enforced as written*." Rory v. Continental Ins. Co., 473 Mich. 457, 468 (2005) (emphasis in original). In "ascertaining the meaning of a contract," courts are to "give the words used in the contract their plain and ordinary meaning that would be apparent to a reader of the instrument." Id. at 464. A contract is ambiguous if its language can be interpreted in two or more ways. Raska v. Farm Bureau Mutual Ins. Co.,

412 Mich. 355, 362 (1982). "[I]f contract language is ambiguous, extrinsic evidence can be presented to determine the intent of the parties." Phillips v. Homer, 480 Mich. 19, 24 (2008). In addition, in interpreting an ambiguous contract, doubts should be resolved against the drafter of the contract. Michigan Chandelier Co. v. Morse, 297 Mich. 41, 46 (1941).

Under the UFE Security Agreement, UFE agreed that Comerica had a security interest in all present and future collateral of UFE. The UFE Security Agreement defined collateral to include UFE's "Accounts Receivable" (including "general intangibles"), inventory, equipment and fixtures, and investment property (including, without limit, securities, securities entitlements, and financial assets). The UCC defines "[i]nvestment property" as "a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account." M.C.L.A. § 440.9102(ww). The term "General Intangibles", under the UCC, includes "any personal property" and "payment intangibles." M.C.L.A. § 440.9102(pp). Comerica argues UFE's 100% shareholder interest in UFE Singapore fits within both of these categories - a general intangible and an investment property - and is therefore included as collateral under the UFE Security Agreement.

Defendants argue the UFE Security Agreement limits the geographic scope of the collateral to include only assets located in Wisconsin, Texas, and Minnesota and thus UFE Singapore's stock is not included. The schedule of collateral locations attached to the UFE Security Agreement states "[n]o assets currently located in non-U.S. facilities of Debtor shall be deemed 'Collateral'." Defendants allege UFE Singapore's assets, including its stock, were located in Singapore.

Comerica responds by arguing the UFE Singapore stock is an intangible and "[n]umerous courts have observed that the situs of intangible property is, in truth, a legal fiction." Acme Contracting, Ltd. v. Toltest, Inc., Case No. 07-10950, 2008 WL 4534175, *6 (E.D. Mich. Oct. 3, 2008). "Various courts have also found that intangible property may have more than one situs." Id. As UFE's place of incorporation is Minnesota and the UFE financing statement was filed in Minnesota, a court might consider Minnesota as one situs. Defendants fail to provide authority to the contrary. As the UFE Singapore stock fits within the definition of "investment property" and the geographical limitation appears directed at tangible assets given that the document lists the cities in which UFE's facilities were located, the stock may be considered collateral under the terms of the UFE Security Agreement.[1]

Defendants also argue the UFE Security Agreement is at least ambiguous as to whether UFE Singapore's stock is included as collateral because there is no specific reference to UFE Singapore within the agreement and because there is language indicating there is no "collateral" outside of the United States. Defendants therefore argue the court should examine extrinsic evidence, such as alleged representations, to ascertain the parties' intent. Defendants argue Comerica has represented, on several occasions, that UFE Singapore's assets are not collateral under the agreements. In support, defendants cite (1) Comerica's suggestion that defendants contact the Development Bank of Japan to ascertain whether the bank would be interested in lending on the UFE Singapore assets;

---

[1]Comerica also argues that this court's December 17, 2010 order resolved this issue. Because that order preserved the parties' arguments, the court has addressed the merits of the claim here.

11

(2) correspondence in which Comerica represented that UFE Singapore's accounts receivable is not collateral; and (3) an agreement indicating that UFE Singapore's accounts receivable should not be used in certain credit calculations. In response, Comerica explains that it has never claimed an interest in the accounts receivable of UFE Singapore. Rather, Comerica claims *an interest in UFE and its assets, including its 100% ownership interest in UFE Singapore*. Even if the court were to find the contract ambiguous, and consider such extrinsic evidence, the court does not believe the evidence relied on by defendants conflicts with Comerica's present claim that UFE Singapore's stock, which was owned by UFE, is collateral under the UFE Security Agreement.

Moreover, defendants' argument that the stock is not collateral under the UFE Security Agreement is belied by defendants' actions. The $950,000 lien defendants placed on the assets of UFE Singapore appears, from the documents, based on defendants' participation in the Comerica loans. Under the SPA, Comerica sold defendants "an undivided, subordinated participation" in the loans to UFE, in other words, "an undivided, subordinated interest in ordinary debt and related collateral security." Despite the opportunity to do so, defendants have never identified what the payment of the $950,000 (now $884,000, after settlement with Willis) would be on account of, if not through its junior participation in Comerica's loans to UFE and Catalina.

Comerica argues the proceeds from the sale of the UFE Singapore stock currently being held in escrow should be paid to Comerica. Section 13 of the SPA provides that defendants shall not recover any amounts owed them under the agreement "unless and until" Comerica's portion of the loan was paid in full. Because the $884,000 contributed by defendants was a participation in Comerica's loans under the SPA only, and not a direct

debt, UFE Singapore did not owe any money to defendants on account of the $884,000. Defendants have no interest in the proceeds from the sale of UFE Singapore's stock until Comerica's debt has been repaid. Comerica's portion of the loan was not paid in full and thus Comerica is entitled to the $884,000.

Comerica also seeks reimbursement for all attorney fees and costs pursuant to paragraph 15 of the SPA which provides:

> Each Participant agrees (which agreement shall survive any termination of the Participations) to reimburse [Comerica] for all reasonable out-of-pocket expenses (including attorneys' fees) incurred by [Comerica] after the date of this Agreement in connection with the Loans or with an event of default or in enforcing the obligations of [Catalina and UFE] under the Loans for which [Comerica] is not reimbursed by [Catalina and UFE], pro rata according to each Participant's percentage of the Loans.

Comerica fails, however, to discuss the application of the following provision in connection with its request:

> Notwithstanding anything to the contrary, each Participant's obligation under this paragraph shall not exceed the sum of any amount distributed or to be distributed on account of the Participations, and Lender may apply any distributions to be made to each Participant's obligations under this paragraph.

As Comerica failed to address this provision or provide additional explanation regarding its request, the court will deny, without prejudice, Comerica's request for attorney fees and costs at this time.

<u>Defendants' Counterclaims</u>

Defendants bring counterclaims for declaratory judgment, fraud/fraudulent inducement, breach of contract, and reformation of contract. Defendants argue the SPA was modified - verbally - so as to allow them to be repaid before Comerica. Defendants argue Comerica fraudulently induced them to enter into the SPA by making the following

misrepresentations: (1) that Comerica did not have a security interest in UFE Singapore under the Security Agreements; (2) that Comerica would not object if the Participants secured their participation interests with a security interest in, and a lien on, UFE Singapore and its assets; (3) that Comerica was not interested in obtaining a security interest in UFE Singapore and its assets; and (4) any lien placed on the assets of UFE Singapore would not be subordinate to any lien held by Comerica.

Michigan does not allow unwritten agreements to modify agreements with financial institutions. M.C.L.A. §566.132(2) prohibits actions against financial institutions to enforce "a promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation" or "a promise or commitment to lend money, grant or extend credit, or make any other financial accommodation" unless the commitment is in writing and signed by an agent of the financial institution. In Crown Tech. Park v. D&T Bank, FSB, 242 Mich. App. 538, 551 (2000), the court found the above-referenced statute is an unqualified and broad ban on attempts to assert or enforce "against a financial institution...an oral promise to waive a loan provision."

In addition, "[w]here a binding agreement is integrated, it supersedes inconsistent terms or prior agreements and previous negotiations to the extent that it is inconsistent with them." Ditzik v. Schaffer Lumber Co., 139 Mich. App. 81, 88 (1984). "[W]hen the parties include an integration clause in their written contract, it is conclusive and parol evidence is not admissible to show that the agreement is not integrated except in cases of fraud that invalidate the integration clause or where an agreement is obviously incomplete 'on its face.'" UAW-GM Human Resources Center v. KSL Recreation Corp., 228 Mich. App. 486, 502 (1998). Moreover, "when a contract contains a valid merger clause, the only fraud that

14

could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." Id. at 503.

In UAW-GM Human Resources Center, the plaintiff asserted it signed a contract to use defendant's hotel for a convention in reliance on the defendant's oral promises to provide plaintiff with a union represented hotel. The contract contained a merger clause. The court found that the fraud asserted required reasonable reliance and the merger clause "made it unreasonable for plaintiff's agent to rely on any representations not included in the letter of agreement." Id. at 504. Thus, the court found the merger clause was valid and parol evidence was not admissible to contradict the merger clause. Id. at 507.

In this case, the SPA and the March Forbearance Agreement contain integration clauses. Section 18 of the SPA provides:

> This Agreement and any other agreements referenced in it constitute the entire understanding of the parties in connection with the matters referenced and shall not be modified or altered except in a ruling signed by Participants and Lender. There are no other agreements, oral or written, express or implied, relating to its subject matter other than this Agreement and the other agreements referenced and all prior agreements and understandings have been merged into this Agreement.

The March Forbearance Agreement states:

> There are no oral agreements among Bank and Borrowers; any agreements concerning the Liabilities are expressed only in the existing Loan Documents. The duties and obligations of Borrowers and Support Parties and Bank shall be only as set forth in the Loan Documents and this Agreement, when executed by all parties.

Defendants acknowledge these integration clauses and rely on Star Ins. Co. v. United Commercial Ins. Agency, Inc., 392 F.Supp.2d 927, 929 (E.D. Mich. 2005), which states:

15

> Michigan courts have said that, as it pertains to representations regarding additional agreements or contractual terms, a party would not be justified in relying on them where there is a merger clause. The reasoning behind this is clear, one should not be heard to complain that they relied on oral promises regarding additional or contrary contract terms when there is written proof, signed by both parties, to the contrary. Yet, a party could still justifiably rely upon representations made by another party regarding things outside the scope of the contractual terms, such as the other party's solvency, indebtedness, experience, clientele, client retention rate, business structure, etc.

Relying on Star, defendants claim Comerica's alleged representations concerning "the scope of the Security Agreements" "and whether those agreements covered the assets of UFE Singapore" constitute representations made by another party regarding things outside the scope of the SPA and thus it was reasonable for defendants to rely on them. The court disagrees. The SPA gave defendants a subordinated participation in Comerica's loans to UFE and Catalina, and the collateral for such loans was described in the Security Agreements. Thus, the scope of the Security Agreements is not an "extraneous" matter. Defendants do not assert fraud specific to the existence of the merger clause. Defendants also do not claim that they were defrauded into believing that the SPA contained a provision with any of the alleged representations. Given the existence of the broad merger clause, defendants could not have reasonably relied on the alleged misrepresentations by Comerica representatives in entering into the SPA. Defendants' fraudulent inducement counterclaim fails.[2]

---

[2]In response to Comerica's request for summary judgment on the counterclaims and affirmative defenses, defendants rely solely on their claim of fraudulent inducement. The parties agree the SPA contains release language, although neither side pointed out such language to the court. Defendant argues fraudulent inducement voids the release in the SPA, however, this argument fails for the same reason their fraudulent inducement claim fails. Even without the release, defendants' counterclaims (aside from the Support Agreement claims, which are not at issue here) fail. The reformation

16

Finally, defendants argue summary judgment is premature because defendants have not had sufficient opportunity to conduct discovery. However, defendants did not submit an affidavit pursuant to Federal Rule of Civil Procedure 56(d) or otherwise explain why discovery is necessary before a determination of the issues presented.

CONCLUSION

For the reasons set forth above, the court grants plaintiff/counter-defendant's motion for partial summary judgment, except as to the request for attorney fees and costs.

Dated:  September 22, 2011

S/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 22, 2011, by electronic and/or ordinary mail.

S/Josephine Chaffee
Deputy Clerk

---

of contract counterclaim is barred by the statute of frauds and also by the integration clause. It is based on fraudulent inducement, which is untenable in light of the integration clause. The declaratory judgment and breach of contract counterclaims fail for the same reasons Comerica's declaratory judgment claim prevails.